# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

# 04 10190 NG

| | |
|---|---|
| W. KENNETH JOHNSON, On Behalf of Himself and All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| BIOPURE CORPORATION, THOMAS A. MOORE, CARL W. RAUSCH and RONALD F. RICHARDS,    MAGISTRATE JUDGE Alexander | ) ) ) ) |
| Defendants. | ) |

Case No. _____

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
SECURITIES LAWS

RECEIPT # _____ 5341/2
AMOUNT $ 150
SUMMONS ISSUED yes
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. FDM
DATE 1-27-04

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Biopure Corporation ("Biopure" or "the Company"), as well as regulatory filings and reports, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ALLEGATIONS

1.      This is a securities class action brought under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a) and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. §240.10b-5, on behalf of all persons who purchased or otherwise acquired the securities of Biopure between March 17, 2003 and December 24, 2003, inclusive (the "Class Period").

complete two offerings of the Company's common stock during the Class Period, generating millions of dollars in proceeds and further, allowing certain Biopure insiders, including defendants Moore and Rausch, to sell hundreds of thousands of their personally held Biopure common shares to the unsuspecting public for proceeds of over $1.6 million.

7.    On December 24, 2003, the last day of the Class Period, after the market closed, defendants revealed in a press release that Biopure had received a Wells Notice from the SEC, indicating the staff's preliminary decision to recommend that the Commission bring civil injunctive proceedings against the Company. Defendants stated that they believed the notice was related to the Company's lack of disclosures regarding its communications with the FDA about the trauma study protocol and the BLA for Hemopure marketing in the United States. Further, defendants shocked the market when they disclosed that the FDA had halted further clinical trials of Hemopure due to safety concerns, thereby jeopardizing the marketability of the drug.

8.    Defendants also stated that they would respond to the FDA's concerns by mid-2004, thereby delaying the commercial release of Hemopure in the United States, if at all, beyond the mid-2003 target date defendants had previously stated.

9.    The market reacted swiftly and dramatically to these disclosures. On December 26, 2003, the price per share of Biopure common stock plummeted 13.83% from its previous trading day's closing price to close at $2.43 per share, a decline of over 70.5% from its Class Period high of $8.25 per share on or about August 21, 2003.

3

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Section 10(b) and

20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated

thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. §§1331 and 1337 and §27 of the Exchange Act (15 U.S.C. §78aa).

12.     Venue is proper in this District pursuant to §27 of the Exchange Act and

28 U.S.C. §1391(b) because many of the acts alleged herein, including the preparation

and dissemination of materially false and misleading information occurred in this

District. Moreover, the Company maintains its principal place of business within this

District.

13.     In connection with the acts alleged in this complaint, defendants, directly

or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications and the facilities of the

national securities markets.

## PARTIES

14.     Plaintiff W. Kenneth Johnson purchased the securities of Biopure during

the Class Period as set forth in his certification attached hereto and has been damaged

thereby.

15.     Defendant Biopure develops and manufactures oxygen therapeutics, a

class of pharmaceuticals that are intravenously administered to deliver oxygen to the

body's tissues. The Company's principal executive offices are located at 11 Hurley

Street, Cambridge, Massachusetts 02141.

4

16.     Defendant Thomas A. Moore ("Moore"), at all relevant times, served as the Company's President and Chief Executive Officer.  Moore is also a director of the Company.

17.     Defendant Carl W. Rausch ("Rausch") is the co-founder of Biopure.  At all relevant times, he served as the Company's Vice Chairman and Chief Technology Officer.

18.     Defendant Ronald F. Richards ("Richards") at all times relevant to this action, served as the Company's Chief Financial Officer.

19.     Defendants Moore, Rausch and Richards are referred to herein as the "Individual Defendants."

20.     The Individual Defendants were officers and directors of the Company at the time the alleged false and misleading statements were made and are liable as direct participants in the wrong complained of herein.  The Individual Defendants, by reason of their executive positions with the Company, board membership and/or representations, and/or ownership of the Company's securities, were controlling persons of the Company and had the power and influence, and exercised the same, to cause the Company to engage in the conduct complained of herein.  The Individual Defendants were in a position to control or influence the contents of, or otherwise cause corrective disclosures to have been made in the public dissemination of the false and misleading information.

21.     During the Class Period, each of the Individual Defendants occupied a position as one of the top executives and was privy to non-public information concerning the Company.  Each of them knew of the adverse facts specified herein.  The Company's

5

press releases, corporate reports to shareholders and filings with the SEC were each group-published documents for which each defendant is equally responsible.

22.    Each of the Individual Defendants and the Company are liable in that they inflated the price of the Company's common stock by making false and misleading statements and omitting material adverse information. The defendants' wrongful course of business (i) artificially inflated the price of Biopure's stock during the Class Period; (ii) deceived the investing public, including Plaintiff and other Class members, into acquiring Biopure stock at artificially inflated prices; and (iii) permitted Biopure to grow and benefit economically from the wrongful course of conduct.

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or otherwise acquired the common stock of Biopure between March 17, 2003 through December 24, 2003, inclusive (the "Class").

24.    Members of the Class are so numerous that joinder of all members is impracticable. As of September 12, 2003, Biopure had approximately 44.3 million shares of common stock issued and outstanding which were actively traded on the NASDAQ National Market. While the exact number of Class members is unknown to the plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of Class members who acquired the Company's common stock during the Class Period.

25.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages because of

6

defendants' unlawful activities alleged herein. Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by plaintiff. Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by defendants' acts as alleged herein;

b.     whether the defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

c.     whether defendants participated directly or indirectly in the course of conduct complained of herein; and

d.     whether the members of the Class have sustained damages as a result of defendants' conduct and the proper measure of such damages.

## SUBSTANTIVE ALLEGATIONS

28.     On March 17, 2003, the first day of the Class Period, Biopure filed its quarterly report on Form 10-Q for the period ending January 31, 2003. The Form 10-Q

7

included the following representations concerning the Company's Hemopure research

and development efforts, stating in pertinent part as follows:

> Research and development expenses continue to include amounts for
> support of the BLA review process including responding to FDA
> inquiries, preparing for and participating in FDA inspections of facilities
> and documentation and preparing for a possible FDA Advisory Panel
> presentation. These BLA support costs were $2,232,000 for the first fiscal
> quarter of 2003 and are expected to continue at approximately the same
> level until the middle of this calendar year, when the Company is hopeful
> that it will receive action by the FDA on the BLA.
>
> * * *
>
> If the FDA were to grant marketing approval for Hemopure this calendar
> year, we anticipate that we would have material revenues from this project
> in fiscal 2004. We do not anticipate that we will attain profitability,
> however, until we are able to increase our manufacturing capacity. There
> are substantial risks and uncertainties relating to whether and when we
> will obtain FDA approval for Hemopure, the timing of the construction of
> additional capacity and other factors that may affect our ability to generate
> a profit from our research and development of Hemopure.

29.    On March 25, 2003, defendants issued a press release announcing the

completion of a public offering of 5,548,480 shares of Biopure common stock for total

proceeds of $13.4 million. The press release included information about the Company's

clinical study of Hemopure.  The press release stated in part as follows:

> Biopure Corporation, headquartered in Cambridge, Mass., is a leading
> developer, manufacturer and marketer of oxygen therapeutics, a new class
> of pharmaceuticals that are intravenously administered to deliver oxygen
> to the body's tissues. Hemopure(R) [hemoglobin glutamer - 250 (bovine)]
> is approved in South Africa for the treatment of adult surgical patients
> who are acutely anemic and for the purpose of eliminating or reducing the
> need for allogenic red blood cell transfusion in these patients. ***Biopure's
> application to market Hemopure in the United States for a similar
> indication in adult patients undergoing elective orthopedic surgery is
> currently being reviewed by the U.S. Food and Drug Administration,
> and the company plans to file additional applications in Europe and
> other markets.***
>
> ***

8

Note: The previously announced $4.9 million in FY02/03 Congressional appropriations administered through the U.S. Army and anticipated $4 million in U.S. Navy funding from a Cooperative Research and Development Agreement (CRADA) for clinical trials of Hemopure in trauma are project-specific funds independent from Biopure's reported cash on hand. Completion of the pivotal RESUS clinical trial of Hemopure in trauma is contingent upon further funding. $908,900 of the Army funding is from Grant DAMD17-02-1-0697, for which the U.S. Army Medical Research Acquisition Activity, 820 Chandler Street, Fort Detrick MD 21702-5014 is the awarding and administering acquisition office.

(Emphasis added).

30.     On April 24, 2003, the defendants announced the appointment of Ketchum to provide public relations support and LifeBrands to provide medical education support for Biopure's investigational oxygen therapeutic, Hemopure(R) [hemoglobin glutamer -- 250 (bovine)].  The press release further stated that:

The U.S. Food and Drug Administration is currently reviewing Biopure's biologic license application (BLA) to market Hemopure in the United States.

\*\*\*

Biopure is seeking FDA approval to market Hemopure for the treatment of acutely anemic adult patients undergoing orthopedic surgery, and for the purpose of eliminating or reducing the need for red blood cell transfusions in these patients. As part of the BLA review process, the FDA has completed its inspections of Biopure's manufacturing and data-handling facilities and has audited its contract research partners and several clinical sites in the United States and South Africa.  Biopure has responded to all questions raised by the FDA during the inspections and has resolved all previous manufacturing documentation issues with the FDA.  Hemopure continues to be manufactured and is available for shipment.

31.     On May 22, 2003, defendants issued a press release announcing Biopure's financial results for the second fiscal quarter ended April 30, 2003.  The Company made further statements regarding the FDA's pending approval of the Company's Hemopure BLA.  The press release, stated in part:

Biopure is hopeful that in mid 2003 the FDA will complete its review and act on Biopure's biologic license application (BLA) to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery. As part of this review, the agency has inspected the company's manufacturing and data-handling facilities and has audited its contract research partners and several clinical sites in the United States and South Africa. Biopure has responded to all questions raised by the FDA to date.

32.    On May 30, 2003, defendants announced that the FDA would complete its review and act on the Company's BLA for Hemopure by August 29, 2003. The press release further stated:

Biopure submitted its BLA on July 31, 2002. Under FDA performance goals in the Prescription Drug User Fee Act (PDUFA III), the agency has up to 10 months from the submission date to review and act on the BLA, making the original action due date June 1, 2003. As part of the normal review process, Biopure has responded to FDA questions regarding the application. The agency has classified the latest responses submitted in mid-May 2003 as additional analyses of previously submitted data, which under FDA standard operating procedures automatically provides the agency up to three months beyond the original action due date to review the data. This type of action is not unusual-the last 11 standard BLAs accepted for review by the FDA have undergone a 13-month review.

"We're very pleased with the FDA's progress in reviewing our application," said Biopure President and CEO Thomas A. Moore. "We continue to work closely with the agency toward a final decision that will allow us to make Hemopure available as an alternative to red blood cell transfusion. We're also continuing our preparations to roll out the product to leading orthopedic surgery centers following approval."

33.    On June 16, 2003, defendants filed a Form 10-Q with the SEC. In the Form 10-Q, defendants made the following representation about the BLA review process:

Research and development expenses continue to include amounts for support of the BLA review process. These BLA support costs were $2,339,000 for the second fiscal quarter of 2003 and are expected to continue at approximately the same level until August 29, 2003, when the Company expects the FDA to act on the BLA. If the FDA were to grant a marketing license at that time, this major project could be substantially complete for orthopedic surgery. Further, any FDA action in August could consist of requests for additional information rather than product

10

approval, including a requirement to conduct additional pre-clinical or clinical trials. Moreover, an approval could be conditioned on the Company's agreement to conduct a "Phase IV", or post- marketing trial to collect additional data. Consequently, the amount of further expenditures on this major project after an FDA response cannot be estimated until we receive the response. If the FDA grants marketing approval for Hemopure this calendar year, we anticipate that we would have material revenues from this project in fiscal 2004.

34.    On July 23, 2003, Biopure completed a public offering of 3,083,000

shares of Biopure common stock, raising $17.2 million in total proceeds.

35.    On August 1, 2003, defendants issued a press release announcing the

FDA's initial response to the BLA review. The press release stated in part:

> Biopure Corporation (Nasdaq: BPUR) announced today that the U.S. Food and Drug Administration (FDA) has completed its review of the company's biologic license application (BLA) for Hemopure(R) [hemoglobin glutamer - 250 (bovine)] and issued a letter requesting additional information. The letter focuses primarily on clarification of clinical and preclinical data and includes some comments on labeling. It does not request additional clinical trials. Biopure has applied to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients.
>
> With 30 days remaining in the original BLA review cycle, the issuance of the letter has suspended the FDA review clock until Biopure submits a complete response.
>
> "We're encouraged that the FDA has finished its review and provided comprehensive feedback in advance of the formal action due date. By maintaining thirty days on the review clock, the FDA is encouraging us to work with them to complete the approval process as quickly as possible," said Biopure President and CEO Thomas A. Moore. "We'll work with the Agency to address the remaining questions and will provide our answers as expeditiously as possible."

36.    On August 21, 2003, Biopure issued a press release announcing its

financial results for the third fiscal quarter ended July 31, 2003. With respect to the

11

FDA's review of the Company's Hemopure BLA, defendants reiterated what was stated

on August 1, 2003:

> On July 30th, the FDA sent Biopure a letter stating that the agency has completed its review of the company's BLA to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. The letter requests additional information and suspends the BLA review clock with 30 days remaining in the original review cycle. It does not request additional clinical trials.

37.    On September 15, 2003, defendants filed with the SEC a Form 10-Q

reiterating Biopure's results as stated above. In addition, the 10-Q stated in part:

> These BLA support costs were $2,170,000 for the third fiscal quarter of 2003 and are expected to continue at approximately the same level until the Company completes its response to the letter received from the FDA on July 30, 2003. The next FDA action, following our response, could consist of a product approval or requests for additional information, including a requirement to conduct additional pre-clinical or clinical trials. Moreover, an approval could be conditioned on the Company's agreement to conduct a "Phase IV", or post- marketing, trial to collect additional data. Consequently, the amount of further expenditures on this major project after an FDA action cannot be estimated until we receive the response.

> We anticipate material revenues from this project within one year if the FDA grants marketing approval for Hemopure. We do not anticipate that we will attain profitability, however, until we are able to increase our manufacturing capacity. There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure, the timing of the construction of additional capacity and other factors that may affect our ability to generate a profit from our research and development of Hemopure.

38.    On October 30, 2003, Biopure issued a press release in which it

announced its plans to respond to the FDA's questions regarding its BLA for Hemopure

by June 30, 2004.  The press release stated in part as follows:

> The company has adjusted its operating plan to reduce expenses and conserve cash while it completes its written response to the FDA.

12

Biopure applied for FDA approval to market the company's oxygen therapeutic, Hemopure, in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. During the past two months the company has had several substantive interactions with the FDA to clarify the Agency's questions. Many of Biopure's responses have been completed. However, some require the retrieval of source medical documents and/or historical blood transfusion data from clinical trial sites in various countries, which will take several months to complete.

***

"In the best interests of our shareholders, today we've taken the steps necessary to more efficiently run our business while we complete our comprehensive response to all of the FDA's questions," said Biopure President and CEO Thomas A. Moore. "We view the Agency's questions as a 'roadmap' to approval and have set a conservative, achievable target date for our response. We remain enthusiastically committed to commercializing Hemopure in the United States as expeditiously as possible."

Biopure's updated plans continue to include clinical development of Hemopure for other potential indications. A Phase II cardiac revascularization trial in patients undergoing elective percutaneous coronary intervention (e.g., angioplasty, stent) is scheduled to begin enrolling patients in Europe this year, and a Phase II trauma trial co-sponsored by the U.S. Army and Navy is anticipated in 2004. These new trials are unrelated to the current Hemopure BLA.

39.     The statements referenced above in ¶¶ 28-38 were materially false and

misleading when made because they failed to disclose certain existing material facts,

including, *inter alia*:

> a.   that Biopure had been notified by the FDA, as early as March 2003 that
>
> the Company's clinical trials of Hemopure for trauma applications had
>
> been suspended as a result of "safety concerns " arising from adverse
>
> clinical data reviewed by the FDA in connection with the Company's

13

BLA for the use of Hemopure in anemic patients undergoing orthopedic surgery;

b.  that as a result of the FDA's suspension of the Company's clinical trials of Hemopure, FDA approval of Biopure's BLA for commercial marketing of Hemopure in the United States could not have occurred, if at all, earlier than late 2004; and

c.  based on the foregoing, defendants' opinions, projections and forecasts concerning the Company financial condition were lacking in a reasonable basis at all times.

## TRUTH IS REVEALED

40.    On December 24, 2003, after the market closed, defendants finally disclosed the problems with the clinical trials. Biopure issued a press release disclosing that it had received a Wells Notice from the SEC, indicating the staff's preliminary decision to recommend that the Commission bring civil injunctive proceedings against the Company. Defendants stated that they believed the notice to be related to the Company's lack of disclosures to the public regarding its communications with the FDA about the trauma study protocol and the BLA for Hemopure. Defendants disclosed, in the same release, that the FDA had halted further clinical trials of Hemopure due to safety concerns, thereby jeopardizing the marketability of the drug. The press release also indicated that regulatory approval of the Hemopure BLA would be postponed at least until the second-half of 2004.

41.    As a direct result of this disclosure, the price of Biopure common stock fell over 13.8% from its previous trading day's closing price to close at $2.43 per share.

14

42.    On January 8, 2004, defendants issued a press release reporting the results

of the Company's meeting with the FDA on January 6, 2004.  Defendants reported that

the FDA expressed further concern with Hemopure's safety and effectiveness.  In the

release, defendants stated, in relevant part:

> During the meeting the FDA expressed concerns about the current BLA
> based on safety and efficacy questions, beyond those cited in the complete
> response letter, arising from the Phase III orthopedic surgery trial. The
> Agency agreed to a continuing dialogue on these and other aspects of the
> BLA through meetings in advance of the company's planned reply to the
> complete response letter. Biopure continues to believe Hemopure is both
> safe and effective for the indication described in the BLA.
>
> The FDA asked Biopure to provide, for its evaluation of the BLA, the
> results of three previously requested preclinical studies. The FDA said that
> these studies are also a prerequisite for further U.S. clinical trials. Biopure
> has already submitted the protocols for these preclinical studies, and the
> Agency agreed to review them promptly. The studies are designed to
> assess the product's effect on tissue perfusion, tissue oxygenation and
> volume hemodynamics (colloidal effect) at high dosages (up to 70 percent
> blood replacement) in conscious swine. The company believes it can
> complete these animal studies within approximately six months after the
> FDA and the company agree on the protocols.
>
> Following its review of these preclinical studies and Biopure's responses
> to the issues raised by the FDA in its complete response letter and during
> the January 6th meeting, the FDA will determine whether additional
> human clinical trials are required.

## SAFE HARBOR

43.    The statutory safe harbor provided for forward-looking statements under

certain circumstances does not apply to any of the allegedly false statements pleaded in

this complaint.  Many of the specific statements pleaded herein were not identified as

"forward-looking statements" when made.  To the extent there were any forward-looking

statements, there were no meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the purportedly forward-

looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Biopure who knew that those statements were false when made.

## FRAUD-ON-THE-MARKET DOCTRINE

44.     At all relevant times, the market for Biopure was an efficient market for the following reasons, among others:

a.      The Company's common stock met the requirements for public listing and was listed and actively traded on the NASDAQ National Exchange, a highly efficient market;

b.      As a regulated issuer, the Company filed periodic public reports with the SEC; and

c.      The Company regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

45.     As a result, the market for Company's common stock promptly digested current information with respect to Biopure from all publicly available sources and reflected such information in the price of the Company's common stock. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the common stock of Biopure at artificially inflated prices and a presumption of reliance applies.

## SCIENTER

46.    The defendants acted with scienter in that they knew that the statements issued and disseminated by Biopure were materially false and misleading, or that the statements therein were made and distributed with reckless disregard for the true facts. The Individual Defendants knew or recklessly disregarded the fact that such misleading statements would be distributed and disseminated to the investing public, and substantially participated in and/or acquiesced in the issuance and dissemination of such statements in violation of the federal securities laws.

47.    The Individual Defendants either knew that such statements were false and misleading or acted with reckless disregard of such falsity since, as senior officers of Biopure, the Individual Defendants knew of (or alternatively had free and unfettered access to materials that would have revealed) the improper accounting practices at Biopure. If the Individual Defendants did not have actual knowledge of the misrepresentations and omissions alleged, then they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether statements disseminated by Biopure were true.

48.    Moreover, Individual Defendants Rausch sold 246,574 shares of common stock for proceeds of approximately $1.6 million during the Class Period.

17

## COUNT I

## AGAINST ALL DEFENDANTS FOR
## VIOLATIONS OF SECTION 10(b) OF
## THE EXCHANGE ACT AND RULE 10b-5

49.    Plaintiff repeats and realleges each and every allegation contained in the above paragraphs, as if fully set forth herein.  This claim is asserted against all defendants.

50.    The defendants carried out a plan, scheme and course of conduct which was intended to and did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Biopure common stock; and (c) cause members of the Class to acquire Biopure common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants took the actions set forth herein.

51.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of Biopure common stock in an effort to maintain artificially high market prices for Biopure common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

52.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, the defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC

18

Regulation S-K (17 C.F.R. §229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

53.     Biopure, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse, material information about the Company's financial results, business, operations, and future outlook as specified herein.  Defendants employed devices, schemes and artifices to defraud, while in possession of adverse, non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure open market purchasers of Biopure's common stock concerning the value of Biopure, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company in the light of the circumstances under which they were made, not misleading, as set forth herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the market for Biopure common stock.

54.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

55.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of

Biopure common stock was artificially inflated throughout the Class Period. In ignorance of the fact that the market price of Biopure common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known or recklessly disregarded by defendants but not disclosed in public statements by defendants, Plaintiff and the other members of the Class purchased or acquired Biopure common stock at artificially high prices and were damaged thereby.

56.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed the false statements to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true nature of the operations of the Company and the noncompliance with federal law, which were not disclosed by defendants, Plaintiff and the other members of the Class would not have purchased or acquired their Biopure common stock or, if they had purchased or acquired such securities, they would not have done so at the artificially inflated prices which they paid.

57.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

58.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their acquisition of Biopure common stock.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

59.     Plaintiff repeats and realleges each and every allegation contained in the above paragraphs, as if fully set forth herein.

60.     The Individual Defendants, while officers and/or directors of Biopure, acted as a controlling person of Biopure within the meaning of Section 20(a) of the Exchange Act as alleged herein.  While officers and/or directors of Biopure, they controlled the content and dissemination of the various statements which Plaintiff contends are false and misleading.

61.     As set forth above, Biopure and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling person of Biopure, the Individual Defendants are also liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of his wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their acquisition of Biopure common stock.

21

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, pray for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiff and other members of the Class damages together with interest thereon;

C.    Awarding Plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.    Awarding Plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 27, 2004

**BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**

Jeffrey C. Block, BBO # 600747
Patrick T. Egan, BBO # 637477
One Liberty Square, 8th Floor
Boston, Massachusetts 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

**KAPLAN FOX & KILSHEIMER**

Laurence D. King
555 Montgomery Street, Suite 1501
San Francisco, CA 94111
Phone: (415) 772-4700
Fax:    (415) 772-4707

-and-

Frederic S. Fox
Joel B. Strauss
Hae Sung Nam
805 Third Avenue, 22nd Floor
New York, NY 10022
Phone: (212) 687-1980
Fax:    (212) 687-7714

23